# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DEMETRIUS MURRY | Case No. 19-CR-776-1<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

On October 8, 2019, the grand jury indicted Defendant Demetrius Murry, for unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1). *See* [2]. On July 17, 2020, Defendant moved to suppress certain evidence, including the firearms and contraband seized from him during a post-arrest pat down on February 16, 2019.[1] *See* [29].

This Court held an evidentiary hearing on Defendant's motion on October 16, 2020, orally denied the motion from the bench on November 13, 2020, and then entered the denial on the docket via a minute order on November 16, 2020, indicating that a written ruling would follow. *See* [46]. This ruling constitutes the Court's findings of fact and conclusions of law.

---

[1] In his motion, Defendant also sought to suppress his negative response to a post-arrest question about whether he possessed a FOID card or a concealed carry license. But the government represented that it would not seek to admit this statement into evidence, [30] at 1 n.1, rendering the issue moot.

1

I.  **Findings of Fact**

On February 16, 2019, at about 8:48 p.m.,[2] Chicago Police Officers Carmen Mostek and Rafael Villegas observed a dark colored sedan at approximately 1350 North Hudson Avenue in Chicago. The Officers, with assistance from Officer C. Julamoke, approached the car, and squad car dashboard camera video and officers' body worn camera videos captured the officers' brief interaction, which lasted less than five minutes.[3] Video shows that Officer Mostek approached the driver's side door of the sedan, asked the driver for his license and insurance, and asked Defendant, a passenger in the car, for his identification; Mostek advised the driver that he was illegally parked too close to the crosswalk and right next to a fire hydrant. The driver told Officer Mostek he was waiting on Defendant, and Defendant stated that they were just leaving.[4] The driver provided his license and insurance, and Defendant handed his identification out the window to the officer on the curb side of the car. Officer Mostek walked around to the passenger side of the car, obtained Defendant's license, and returned to the officers' squad car, where she ran both identifications in her car

---

[2] The parties submitted an agreed statement of facts [42], which indicates that the incident occurred at 10:48 p.m. Although the Court generally accepts the parties' agreed facts, it declines to find that incident occurred at 10:48 p.m. (this may be a typographical error), because the underlying evidence (including the OEMC records and arrest report) confirms that the incident occurred at 8:48 p.m. Ultimately, however, the time difference between the stipulation and the evidence is not material to the motion, as the parties agree on the duration of the stop.

[3] The dashboard camera video does not depict any person exiting or entering the sedan prior to the officers' stop of the car.

[4] Given the evidence at the hearing (including the camera footage and the officers' credible observations), the facts did not trigger any exception for momentarily picking up or discharging passengers. 625 ILCS 5/11-1303(a)(2)(b).

2

computer system. She then told Officer Julamoke, who was standing outside the car, that the passenger "needs to go in" for failure to register. She paused to double check the information, and then confirmed that Defendant was subject to arrest.

After speaking with Officer Mostek, Officer Julamoke asked Defendant to step out of the car and asked him whether he had anything on him; Defendant exited the vehicle but did not respond to Officer Julamoke's question. Officer Julamoke then handcuffed Defendant and, in a post-arrest pat down, found two handguns concealed in Defendant's clothing: a Bersa Thunder .380 acp caliber semiautomatic handgun and a Kahr CT4040 .40 caliber S&W semiautomatic handgun. Officers also found $244 in cash and approximately 14 grams of marijuana on Defendant.[5]

The parties agree that the City of Chicago Municipal Code § 8-26-055 required Defendant to register annually as a gun offender, that he last registered in October 2017, and that his failure to register thereafter thus constituted a valid basis for arrest. Defendant argues, however, that the officers lacked reasonable suspicion to justify the initial stop of the sedan in the first instance.

The Court held an evidentiary hearing on October 16, 2020 to resolve the issue. At that time, the government called Officer Mostek, who testified that, in February 2019, she was assigned to regular patrol on Beat 1821 and was working third watch on

---

[5] In addition to arresting Defendant, Officers issued two tickets to the driver of the sedan—one for parking within 15 feet of a fire hydrant, in violation of MCC Chapter 9, § 64-100(a), and one for parking in a crosswalk, in violation of MCC Chapter 9, § 64-110(c); *see also* 625 ILCS 5/11-1303(a)(2)(b) (the section of the Illinois Vehicle Code that prohibits "stand[ing] or park[ing] a vehicle, whether occupied or not…within 15 feet of a fire hydrant.").

3

February 16, 2019 with her partner, Officer Rafael Villegas. [76] at 9–10. She testified that, while driving down North Hudson Avenue, they noticed a sedan, which looked occupied, parked next to a fire hydrant in a crosswalk.[6] *Id.* at 10. She testified that, because the area is known to be a high crime area, she "went over OEMC" to advise that she was going to conduct a traffic stop and to request the assistance of another car. *Id.* at 11. OEMC records confirm that Officer Mostek indicated her intent to initiate a traffic stop at 20:36. *Id.* at 24–25; Government's Exhibit 1. She testified that she and her partner drove past the sedan a second time, used their vehicle spotlight to confirm her initial observations (seeing silhouettes in the car), and found that the car was, in fact, occupied.[7] *Id.* at 11. At this point, the officers decided to investigate and conduct a traffic stop. *Id.* at 13.

Officer Mostek's partner, Officer Villegas, also testified at the October 16, 2020 hearing. He indicated that, on February 16, 2019, he was a beat officer in 1821 assigned to "patrol the beat within square blocks of a known narcotics called for service area."

---

[6] Based upon the entire record developed at the evidentiary hearing, this Court credits the officer testimony, and makes the factual finding that the car was, in fact, in the crosswalk and parked next to the fire hydrant, and that the officers made such observations prior to conducting the stop.

[7] Defendant disputes Officer Mostek's claim that they drove past the car once and came around the block again before initiating a stop, *see* [76] at 15–18. OEMC records, admitted without objection, confirm that Officer Mostek called in the officers' intent to conduct a traffic stop at 20:36:06, requested another car at 20:36:36, and ran Defendant's and the driver's identifications at 20:39:12 and 20:41:00, respectively, approximately three or four minutes later, *Id.* at 25–26. The chronology remains consistent with Officer Mostek's testimony, and the Court finds her to be credible on this issue.

[76] at 30. Officer Villegas[8] testified that, while on patrol, he and his partner turned left onto Hudson and saw a sedan, which appeared to be occupied, parked but idling next to the crosswalk sign. *Id.* at 32–33. He testified that he observed the sedan parked within the crosswalk markings on the street and that, after observing the sedan, he and his partner requested additional units to the scene because the area was "a known area for high narcotics or police service" and they wanted to "play it better safe than sorry." *Id.* at 34–35. Officer Villegas then activated his squad car's blue lights to proceed with the traffic stop. *Id.* at 35. Once he exited his vehicle, he confirmed that the front end of the sedan was within the markings on the crosswalk, and also that the sedan was parked right next to a red fire hydrant. *Id.* at 36–37. Officer Villegas testified that, in connection with this stop, he cited the driver for being parked within 15 feet of a fire hydrant and for being parked within a crosswalk. *Id.* at 37–38.

## II. Conclusions of Law

Defendant first argues that the seized evidence should be suppressed because the traffic stop was unlawful. The evidence does not support his claim.

Officers may "stop and detain briefly a person for investigative purposes when the officer has a reasonable suspicion, supported by articulable facts, that criminal activity is afoot." *United States v. Pace*, 48 F.4th 741, 749 (7th Cir. 2022) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). Reasonable suspicion exists "when an officer can point to

---

[8] By the time of the evidentiary hearing on October 16, 2020, Rafael Villegas had left the police department and become a firefighter with the City of Chicago. But for ease of reference, the Court nonetheless refers to this individual as Officer Villegas throughout.

5

specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (quoting *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020)). Although reasonable suspicion "requires something less than what is necessary to show probable cause, it requires more than a mere 'hunch.'" *Id.* (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)). *See also United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018) ("To pull a car over for a brief investigatory stop, a police officer must have 'at least [an] articulable and reasonable suspicion' that the particular person stopped is breaking the law.") (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)).

In *Pace*, for example a police officer conducted a brief investigatory stop of an individual whose car was parked in a store parking lot after business hours; the individual claimed to be lost and asked for directions to the home of a person the officer knew was a methamphetamine user and dealer. 48 F.4th at 748–50. The Seventh Circuit held that the officer's specific, articulable factsm viewed objectively, justified a brief investigation to confirm or dispel the suspicion of illegal drug activity. *Id.* at 749. So too here.

The officers' knowledge that the patrol beat constituted an area known for high narcotics service, coupled with their specific observations of the sedan parked next to a fire hydrant, in a crosswalk with occupants inside, constitutes specific articulable facts that supply the reasonable suspicion to justify the officers' decision to activate their lights and "stop" the car. The officers also had reasonable suspicion to believe that the

driver of the sedan was violating the Chicago Municipal Code by parking next to the fire hydrant and in a crosswalk. Officer Mostek testified that, when she and her partner drove past the car the first time, she noticed that it was parked next to a fire hydrant and on the crosswalk. [76] at 10, 22. And Officer Villegas testified that he could see that the car was parked within the crosswalk markings before he activated the blue lights to effect the stop. *Id.* at 32, 34–35. This Court finds the officers' testimony credible, and it stands unrebutted in the record.

*United States v. Shields*, 789 F.3d 733, 745 (7th Cir. 2015), is particularly instructive. In *Shields*, patrol officers observed the defendant's parked SUV partially blocking a crosswalk; they pulled over, approached the defendant's car, and asked the defendant for his license; after handing over his license, the defendant got out of his car and ran; the officers chased him, tackled him, and found a loaded .22 caliber revolver on the ground under him. 789 F.3d at 738–39. After being indicted, Shields moved to suppress the gun, arguing that the initial traffic stop was illegal. *Id.* at 739. The district court denied the motion based in part on its finding that the officers "acted within the bounds of the Fourth Amendment in conducting the traffic stop because they had probable cause to believe that Mr. Shields had committed a traffic offense by blocking the crosswalk." *Id.* The Seventh Circuit affirmed, holding that the officers' belief that Shields "was in the process of committing a parking offense," constituted "reasonable suspicion to believe that the law was being violated." *Id.* at 745. Given the analogous

7

facts, *Shields* compels the Court to reject Defendant's argument that the initial stop violated the Constitution.

Defendant offers a second, separate argument: he claims that, even if the initial stop passed muster, the guns and contraband should nonetheless be suppressed because the warrant check on Defendant's identification constituted an unreasonable extension in the scope of the seizure. Again, the factual record undermines Defendant's claim.

Although an otherwise constitutional traffic stop may become unlawful if "prolonged beyond the time reasonably required to complete the mission," the "mission" itself may lawfully include not only addressing the violation that warranted the stop, but also attending to related safety concerns. *United States v. Lewis*, 920 F.3d 483, 491 (7th Cir. 2019); *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). Indeed, checking the criminal histories of the occupants of a car during a traffic stop—"a procedure in itself normally reasonable, as it takes little time and may reveal outstanding arrest warrants"—is "permissible even without reasonable suspicion." *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015). Here, the parties agree that the entire incident, from the time Officer Villegas activated the squad car's blue lights, through the identification check, to the time Defendant was arrested, took less than five minutes. [42] at ¶ 12. OEMC records confirm the timing of the incident. The procedure, in fact, took little time, and, consistent with *Sanford*, did not unreasonably prolong the officers' investigative stop. Defendant's objection notwithstanding, the law

does not require officers to engage in traffic stops without taking the minimal safety precaution of running a warrant check. *See Rodriguez,* 575 U.S. at 354–55 (beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop, such as checking identification and determining whether there are outstanding warrants).

### III. Conclusion

Consistent with the above findings of fact and conclusions of law, this Court denied Defendant's motion to suppress [29] via its prior ruling [46] (oral ruling made on November 13, 2020, and then entered via minute order dated November 16, 2020).

Date: March 20, 2023

        ENTERED:

        */s/ John Robert Blakey*
        John Robert Blakey
        United States District Judge